UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

SHEILA BEAGLE,

     Plaintiff,

v.                              Case No:   2:15-cv-557-FtM-MRM

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

_____/

## OPINION AND ORDER

Before the Court is Plaintiff Sheila Beagle's Complaint (Doc. 1) filed on September 15, 2015.  Plaintiff seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying her claim for a period of disability, disability insurance benefits, and supplemental security income.  The Commissioner filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties filed legal memoranda in support of their positions.  For the reasons set out herein, the decision of the Commissioner is **AFFIRMED** pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

I.     **Social Security Act Eligibility, the ALJ Decision, and Standard of Review**

     A.     **Eligibility**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(i), 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. The impairment must be severe, making the claimant unable to do her previous work or any

other substantial gainful activity that exists in the national economy.  42 U.S.C. §§ 423(d)(2), 1382c(a)(3); 20 C.F.R. §§ 404.1505 - 404.1511, 416.905 - 416.911.  Plaintiff bears the burden of persuasion through step four, while the burden shifts to the Commissioner at step five.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

### B.  Procedural History

On March 29, 2011, Plaintiff filed an application for disability insurance benefits ("DIB") and supplemental security income ("SSI").  (Tr. at 144, 145, 322-32).  Plaintiff asserted an onset date of February 1, 2008.  (Tr. at 322).  Plaintiff's applications were denied initially on July 12, 2011, and on reconsideration on October 7, 2011.  (Tr. at 144, 145, 166, 167).  Two hearings were held before Administrative Law Judge ("ALJ") Rosanne M. Dummer on July 16, 2013 and November 12, 2013.  (Tr. at 36-76; 83-116).  The ALJ issued an unfavorable decision on November 22, 2013.  (Tr. at 13-30).  The ALJ found Plaintiff not to be under a disability from February 1, 2008, through the date of the decision.  (Tr. at 29).

On August 19, 2015, the Appeals Council denied Plaintiff's request for review.  (Tr. at 1-5).  Plaintiff filed a Complaint (Doc. 1) in the United States District Court on September 15, 2015.  This case is ripe for review.  The parties consented to proceed before a United States Magistrate Judge for all proceedings.  (*See* Doc. 16).

### C.  Summary of the ALJ's Decision

An ALJ must follow a five-step sequential evaluation process to determine if a claimant has proven that she is disabled.  *Packer v. Comm'r of Soc. Sec.*, 542 F. App'x 890, 891 (11th Cir. 2013) (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).[1]  An ALJ must determine

---

[1]  Unpublished opinions may be cited as persuasive on a particular point.  The Court does not rely on unpublished opinions as precedent.  Citation to unpublished opinions on or after January

whether the claimant:  (1) is performing substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals an impairment specifically listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform her past relevant work; and (5) can perform other work of the sort found in the national economy.  *Phillips v. Barnhart*, 357 F.3d 1232, 1237-40 (11th Cir. 2004).  The claimant has the burden of proof through step four and then the burden shifts to the Commissioner at step five.  *Hines-Sharp v. Comm'r of Soc. Sec.*, 511 F. App'x 913, 915 n.2 (11th Cir. 2013).

The ALJ found that Plaintiff met the insured status requirements through September 30, 2013.  (Tr. at 16).  At step one of the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 1, 2008, the alleged onset date.  (Tr. at 16).  At step two, the ALJ found that Plaintiff suffered from the following severe impairments:  status post 1990 corrective surgery for scoliosis with Harrington rod and degenerative changes; hypertension; depression; anxiety; and substance abuse (20 CFR 404.1520(c) and 416.920(c)).  (Tr. at 16).  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, subpt. P, app. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  (Tr. at 16-17).  At step four, the ALJ determined that Plaintiff has the residual functional capacity ("RFC") to perform unskilled, light work with the following additional limitations:

> the claimant can lift/carry about fifty pounds occasionally and twenty-five pounds frequently; sit about five of eight hours, up to one hour at a time; stand about two of eight hours, for about thirty minutes at a time; and can walk about one of eight hours, for about fifteen minutes at a time.  She can occasionally operate foot controls, climb, balance, stoop, kneel, crouch, and crawl.  She can occasionally

1, 2007 is expressly permitted under Rule 31.1, Fed. R. App. P.  Unpublished opinions may be cited as persuasive authority pursuant to the Eleventh Circuit Rules.  11th Cir. R. 36-2.

work at unprotected heights, around moving mechanical parts, humidity, and wetness. She can occasionally work in extremes of heat and cold, and vibration. She should not do any commercial driving (Exhibit B18F). Secondary to mental limitations, she is able to understand, remember, and carry out simple instructions. She is able to sustain attention for simple tasks for extended periods of two-hour segments in an eight-hour day. She is able to tolerate brief but superficial contact with others, with no public contact. She is able to adapt to changes as needed for simple, routine, repetitive type tasks.

(Tr. at 18, 27). The ALJ determined that Plaintiff was unable to perform any past relevant work. (Tr. at 26). At step five, the ALJ found that considering Plaintiff's age, education, work experience, residual functional capacity and vocational expert testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that the claimant can perform. (Tr. at 26-27). Specifically, the ALJ determined that examples of jobs that Plaintiff was able to perform include: (1) laundry worker, DOT # 361.687-014; (2) collator, DOT # 653.687-010; (3) office helper, DOT # 239.567-010); (4) bench assembler, DOT # 706.684-042); and (5) inspector/packager, DOT # 559.687-074.[2] The ALJ concluded that Plaintiff was not under a disability from February 1, 2008, through the date of the decision. (Tr. at 29).

### D.     Standard of Review

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standard, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. §405(g). Substantial evidence is more than a scintilla; *i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.

---

[2] "DOT" refers to the *Dictionary of Occupational Titles*.

*Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982); *Richardson*, 402 U.S. at 401).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that "the evidence preponderates against" the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

## II.    Analysis

On appeal, Plaintiff raises three issues. As stated by Plaintiff they are:

1)    The ALJ failed to fulfill her obligation to fairly and fully develop the record within the meaning of 20 C.F.R. §§ 404.1512(d), 416.912(d) when she did not order cognitive and/or IQ testing, despite being presented with evidence that Plaintiff had an intellectual disability at least in the borderline range of functioning.

2)    The residual functional capacity ("RFC") assessment is not sufficiently specific because the ALJ failed to quantify or otherwise describe in vocational terms the Plaintiff's degree of limitation in social interaction, as required by 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

3)    The ALJ erred by failing to give great or controlling weight to the opinion of Plaintiff's treating physician, as required by Social Security Ruling ("SSR") 96-2p, when she failed to provide good cause for rejecting the treating opinion in favor of an opinion from a one-time consulting examiner.

(Doc. 18 at 2-3). The Court will address each issue in turn.

### A.    Consultative Examination

Plaintiff argues that the ALJ erred by failing to fully and fairly develop the record by ordering a consultative mental examination showing Plaintiff's IQ score. The Commissioner

asserts in response that the ALJ did not err in failing to obtain another consultative examination and the ALJ developed the record both fully and fairly.

A plaintiff bears the burden of proving she is disabled and is responsible "for producing evidence in support of h[er] claim." *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (citing 20 C.F.R. §416.912(a)).  However, an ALJ "has a basic duty to develop a full and fair record." *Id*. (citing 20 C.F.R. 416.912(d)).  *See* 20 C.F.R. §404.1545(a)(3) ("However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.").  This duty applies whether or not the claimant is represented by counsel. *Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995).

An ALJ is not required to order a consultative examination "as long as the record contains sufficient evidence for the administrative law judge to make an informed decision." *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1269 (11th Cir. 2007).  In addition, a plaintiff must show prejudice before a court will find that a plaintiff's "'right to due process has been violated to such a degree that the case must be remanded to the Secretary for further development of the record.'" *Brown*, 44 F.3d at 934-35 (citing *Kelley v. Heckler*, 761 F.2d 1538, 1540 (11th Cir. 1985)).  To determine if prejudice exists, the Court must determine if the record contains evidentiary gaps that will result in unfairness or clear prejudice.  *Id*. at 935 (citing *Smith v. Schweiker*, 677 F.2d 826, 830 (11th Cir. 1982)).  "The lack of medical and vocational documentation supporting an applicant's allegations of disability is undoubtedly prejudicial to a claim for benefits.  We have no way of knowing whether the evidence missing from the case would sustain [claimant's] contentions of her inability to work." *Id*.

In this case, Plaintiff contends that the ALJ penalized Plaintiff by finding that she did not meet a listing because "no scores from an examination made to determine the claimant's valid IQ are present in the record." (Doc. 18 at 9, citing Tr. at 17). Plaintiff claims that the ALJ should have ordered a consultative examination to determine Plaintiff's valid IQ score. (Doc. 18 at 9). Plaintiff argues that if no IQ scores were present in the record, then the record lacked evidence and, as a result, the ALJ failed to fully and fairly consider whether Plaintiff meets Listing 12.05(C). (Doc. 18 at 9).

The Commissioner asserts that the record here is complete and contained enough information for the ALJ to issue a decision as to whether Plaintiff is disabled. (Doc. 21 at 4). Further, the Commissioner claims that Plaintiff was not diagnosed with any intellectual impairment. (Doc. 21 at 5). Rather, Plaintiff was diagnosed with "rule out" borderline intellectual function and, therefore, the Commissioner contends that there is no issue of intellectual disability in this case. (Doc. 21 at 5). Moreover, the Commissioner argues even if the record contained IQ scores that satisfy one part of Listing 12.05(C), Plaintiff would still not meet the listing because the record fails to contain evidence that Plaintiff had the required deficits in adaptive functioning before age 22. (Doc. 21 at 8, citing Tr. at 18).

Basically, Plaintiff is asserting that the ALJ should have ordered a consultative examination prior to determining that Plaintiff did not meet the listings at step three of the sequential evaluation. At step three, to meet the requirements of a listing, a plaintiff must "have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C.F.R. § 404.1525(d). The burden is on Plaintiff to show that she meets the listings. *Wilkinson on Behalf of Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987). If an impairment manifests

only some of the criteria, then it does not qualify, no matter how severe the impairment. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). To meet a listing, a plaintiff must have a diagnosis included in the listings, and "must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (citing 20 C.F.R. § 1525(a)-(d)). "If a claimant has more than one impairment, and none meets or equals a listed impairment, the Commissioner reviews the impairments' symptoms, signs, and laboratory findings to determine whether the combination is medically equal to any listed impairment." *Id*. (citing 20 C.F.R. § 404.1526(a)).

> Listing 12.05 provides in part as follows:
>
> Intellectual disability:  Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.[3]
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

20 C.F.R. pt. 404, subpt. P., app. 1, § 12.05. Plaintiff contends that if the ALJ would have ordered a consultative examination to determine Plaintiff's IQ score, Plaintiff would have satisfied Listing 12.05(c). (Doc. 18 at 7, 9). To satisfy Listing 12.05(C), an individual must have "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, subpt. P, app. 1 § 12.05(C).

---

[3] On August 1, 2013, the Social Security Administration changed the terminology in Listing 12.05 from "mental retardation" to "intellectual disability," but this change does not "affect the actual medical definition of the disorder or available programs or services." *Hickel v. Comm'r of Soc. Sec.*, 539 F. App'x 980, 982 n.2 (11th Cir. 2013) (citing 79 Fed. Reg. 46,499, 46,501, later codified in 20 C.F.R. pt. 404, subpt. P, app.1).

The structure of Listing 12.05 differs from other mental disorder listings by containing four sets of criteria.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.  A plaintiff must satisfy the diagnostic description and one of the four sets of criteria.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.  "To meet listing 12.05 ('intellectual disability'), 'a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22.'"  *Frame v. Comm'r Soc. Sec. Admin.*, 596 F. App'x 908, 910 (11th Cir. 2015) (citing *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).  The Eleventh Circuit has held that if the record demonstrates a plaintiff's manifested deficits in adaptive functioning after the age of twenty-two, then an ALJ may presume that the plaintiff manifested a mental disability prior to age twenty-two.  *See Hodges v. Barnhart*, 276 F.3d 1265, 1269 (11th Cir. 2001).

In the instant case, the ALJ determined that Plaintiff failed to meet the criteria for Listing 12.05(c), when the ALJ found that

> [a]lthough borderline intellectual functioning was suspected, no scores from an examination made to determine the claimant's valid IQ are present in the record. . . . [T]the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.  The medical record contains no scores from an examination made to determine the claimant's valid IQ.

(Tr. at 17).  Plaintiff argues that she made a *prima facie* showing of the presence of an intellectual disability as evidenced by the consultative examination by Paula Bowman, Psy.D, a postdoctoral resident and Cheryl Kasprzak, Psy.D, a licensed psychologist on June 27, 2011.  (Doc. 18 at 8).  The Commissioner responds that Dr. Kasprzak diagnosed Plaintiff with "rule out" borderline intellectual functioning and not an actual diagnosis of borderline intellectual functioning.  (Doc. 21 at 5).

Upon review of Dr. Bowman's and Dr. Kasprzak's evaluation, the evaluation indicates a diagnosis of rule out borderline intellectual functioning and not a diagnosis of borderline intellectual functioning. (*See* Tr. at 508). In addition, Dr. Bowman and Dr. Kasprzak opined that Plaintiff's intellectual ability is "estimated to be in the Borderline range." (Tr. at 508).

In this case, Plaintiff was diagnosed with possible Borderline Intellectual Functioning. (*See* Tr. at 508). A diagnosis of Borderline Intellectual Functioning, however, does not equate to an Intellectual Disability in Listing 12.05(C). *See Harris v. Comm'r of Soc. Sec.*, 330 F. App'x 813, 815 (11th Cir. 2009) (holding plaintiff did not meet Listing 12.05(C) because plaintiff was diagnosed with borderline intellectual functioning and not mental retardation). Moreover, a diagnosis of borderline intellectual function is "mutually exclusive of mental retardation." *See Jordan v. Comm'r of Soc. Sec. Admin.,* 470 F. App'x 766, 768 (11th Cir. 2012). Thus, Plaintiff was not diagnosed with Intellectual Disability to meet Listing 12.05(C).

In addition, even if Plaintiff had a valid IQ score within the range to meet Listing 12.05(C), a valid IQ score is only one factor to consider and is not conclusive by itself. *Hickel v. Comm'r of Soc. Sec.*, 539 F. App'x 980, 983 (11th Cir. 2013). Other factors to consider are a plaintiff's daily activities and other evidence of record. *Id.* at 983-84. In the instant case, the ALJ acknowledged that Plaintiff had learning disabilities and was in special education classes, but considered Plaintiff's daily activities, including that Plaintiff was able to take care of her personal hygiene, cook and feed herself, and handle laundry. (Tr. at 17, 19). Further, the ALJ considered Dr. Bowman's and Dr. Kasprzak's evaluation that found Plaintiff had the requisite skills and cognitive ability to manage finances independently. (Tr. at 21; Tr. at 508). Moreover, the ALJ found that Plaintiff was employed and able to perform the jobs of a janitor/maintenance painter and a fast food worker/cashier. (Tr. at 26).

The Court finds that Plaintiff failed to show that she was diagnosed with Intellectual Disability to satisfy Listing 12.05(C). Thus, even without an IQ score, the ALJ was able to determine that Plaintiff did not meet Listing 12.05(C). Therefore, the ALJ did not err by failing to order a consultative examination to determine Plaintiff's IQ score Moreover, even without Plaintiff's IQ score, the ALJ's decision that Plaintiff did not meet Listing 12.05(c) is supported by substantial evidence in the record. Thus, the Court finds that the record contains sufficient evidence for the ALJ to have made an informed decision.

### B.    Limitation as to Social Interactions

Plaintiff asserts that the ALJ erred in failing to specify the degree of limitation of Plaintiff's social interactions. (Doc. 18 at 9-10). The ALJ found Plaintiff capable of tolerating "brief but superficial contact with others, with no public contact." (Doc. 18 at 10; Tr. at 18). Plaintiff argues that the terms, "brief but superficial contact with others," were not sufficiently exact and, as a result, the hypothetical question given to the vocational expert was not specific enough for the vocational expert to render an accurate opinion as to jobs in the national economy that Plaintiff is able to perform. (Doc. 18 at 10-11). The Commissioner asserts that the hypothetical questions posed to the vocational expert were specific enough for the vocational expert to determine that there are jobs that Plaintiff could perform in the national economy. (Doc. 21 at 16).

At step five of the sequential evaluation, the ALJ must determine whether jobs exist in significant numbers in the national economy that a plaintiff can perform. *Winchell v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011). "The general rule is that after determining the claimant's RFC and ability or inability to return to past relevant work, the ALJ may use the grids to determine whether other jobs exist in the national economy that a claimant is able to perform."

*Phillips v. Barnhart*, 357 F.3d 1232, 1242 (11th Cir. 2004).  An ALJ may use the Medical

Vocational Guidelines or may obtain the testimony of a vocational expert to determine whether

there are jobs that exist in the national economy that a claimant can perform.  *Winchell*, 631 F.3d

at 1180.  If the ALJ decides to use a vocational expert, for the vocational expert's opinion to

constitute substantial evidence, "the ALJ must pose a hypothetical question which comprises all

of the claimant's impairments."  *Id.* (citing *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir.

2002)).

        In the RFC, the ALJ found, *inter alia*, that Plaintiff "is able to tolerate brief but

superficial contact with others, with no public contact."  (Tr. at 18).  For the hypothetical to the

vocational expert, the ALJ stated, "[t]he person is able to tolerate brief but superficial contact

with others, however not public contact."  (Tr. at 51).  The vocational expert asked for

clarification as to contact with coworkers.  (Tr. at 52).  The ALJ clarified that "[t]he contact with

others should be brief and superficial, however no contact with the public."  (Tr. at 53).  The

vocational expert explained, "[w]ell, I think that as an office helper there would be brief contact

because the unskilled tasks that they would be assigned, such as filing [and] photocopying, I

think that the instructions would be brief because they won't be complex assignments."  (Tr. at

54).  Later, when questioned by Plaintiff's counsel, the vocational expert further explained that

simple, routine, repetitive tasks do not require a lot of detailed instruction or demonstration.  (Tr.

at 64).  The vocational expert concluded that these type of jobs would require only brief contact

with coworkers.  (Tr. at 64-65).

        Upon review of the exchange between the ALJ and the vocational expert, the Court finds

that the ALJ explained Plaintiff's limitation for "brief but superficial contact" and the vocational

expert demonstrated she understood this limitation by explaining why she chose an office helper

job to fit the criteria given by the ALJ in the hypothetical.  (*See* Tr. at 52-54).  Later, the vocational expert further clarified the types of jobs that require only brief contact because the job entails only simple, routine, and repetitive tasks not requiring a lot of interaction with co-workers.  (Tr. at 64).  The Court finds that the ALJ explained the terms "brief but superficial contact" when posing the hypothetical question to the vocational expert and the vocational expert clarified and explained her understanding of the terms when she responded to the questioning by both the ALJ and by Plaintiff's counsel.  Thus, the Court finds that the hypothetical posed to the vocational expert contained the limitations found by the ALJ in Plaintiff's RFC, the testimony of the vocational expert constitutes substantial evidence, and the ALJ did not err in relying of the vocational expert's testimony to determine that there are jobs that exist in the national economy that Plaintiff is able to perform.

### C.      Treating Physician

Plaintiff contends that the ALJ erred in affording little weight to the opinion of treating physician, Sydel Legrande, M.D.  (Doc. 18 at 12-13).  The Commissioner responds that the ALJ properly evaluated the opinion of Dr. Legrande.  (Doc. 21 at 9).

### 1.      Standard for Weight of Treating Physician

At the fourth step in the evaluation process, the ALJ is required to determine a claimant's RFC and based on that determination, decide whether the plaintiff is able to return to his or her previous work.  *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986).  The determination of a claimant's RFC is within the authority of the ALJ.  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  Along with the claimant's age education, and work experience, the RFC is considered in determining whether the claimant can work.  *Id*. Weighing the opinions and findings of treating, examining, and non-examining physicians is an

integral part of the ALJ's RFC determination at step four.  *See Rosario v. Comm'r of Soc. Sec.*, 877 F. Supp. 2d 1254, 1265 (M.D. Fla. 2012).

"The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986) (citation omitted).  The Eleventh Circuit has held that whenever a physician offers a statement reflecting judgments about the nature and severity of a claimant's impairments, including symptoms, diagnosis, and prognosis, what the claimant can still do despite his or her impairments, and the claimant's physical and mental restrictions, the statement is an opinion requiring the ALJ to state with particularity the weight given to it and the reasons therefor.  *Winschel v. Comm'r of Soc. Sec.*, 631 F3d 1176, 1178-79 (11th Cir. 2011).  Without such a statement, "it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence."  *Id.* (citing *Cowart v. Shweiker*, 662 F.2d 731, 735 (11th Cir. 1981)).

The opinions of treating physicians are entitled to substantial or considerable weight unless good cause is shown to the contrary.  *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004).  The Eleventh Circuit concluded that good cause exists when the:  (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.  *Id.*

## 2.    Dr. Legrande's Treatment Records and Opinions

Dr. Legrande treated Plaintiff from April 10, 2012 through July 1, 2013.[4]  (*See* Tr. at 673-722).  Plaintiff went to Dr. Legrande with complaints of lower back pain.  (Tr. at 673).  As described by Plaintiff to Dr. Legrande, the pain was felt bilaterally and was an aching, sharp, shooting, stabbing, throbbing and tingling pain.  (Tr. at 673).  According to Plaintiff, the pain radiated to the back and bilateral lower extremities.  (Tr. at 673).  Plaintiff claimed that the pain was worse with bending, increased activity, lifting, movement, sitting and/or standing for long periods of time, and walking.  (Tr. at 673).  With pain medication, Plaintiff stated that her pain was a 3 on a scale of 1 to 10, but without medication her pain was a 10 out of 10.  (Tr. at 673).  Plaintiff told Dr. Legrande that she took her pain medication in the middle of the night due to pain.  (Tr. at 673).  Dr. Legrande noted that Plaintiff was able to do all of her activities of daily living when taking her medication including:  walking, standing, sitting, and climbing stairs.  (Tr. at 673).  Further, Dr. Legrande noted that Plaintiff's mood improved with medication.  (Tr. at 673).  If Plaintiff did not take her medication, Plaintiff reported that she had problems with walking, standing, sitting, climbing stairs, and her mood.  (Tr. at 673).  At this visit, Plaintiff reported that all of her medications except Oxycodone worked well to "neutralize and stabilize pain."  (Tr., at 675).  Dr. Legrande assessed Plaintiff with pain, lumbar spine; scoliosis associated with other condition; scoliosis with Harrington rod placement; and lumbar degenerative disc disease.  (Tr. at 674).  Dr. Legrande changed Plaintiff's medication from

---

[4]  The record contains documentation from Dr. Legrande beginning on April 10, 2012.  (Tr. at 673).  The Court notes that this treatment note is entitled, "Follow Up Visit" indicating that Dr. Legrande treated Plaintiff prior to April 10, 2012, but these prior treatment notes are not of record.

Oxycodone to Dilaudid, refilled her other prescriptions because Plaintiff was "able to perform activities of daily living with current regime.  No adverse effect[s] were reported from the current medications."  (Tr. at 675).

Plaintiff returned to Dr. Legrande on May 30, 2012, August 6, 2012, and August 30, 2012 with similar complaints.  (Tr. at 677-688).[5]  Plaintiff stated that she was doing well with the pain medication and it helped to relieve sixty to seventy percent of her current pain.  (Tr. at 677,681, 685).

On October 1, 2012, Plaintiff returned to Dr. Legrande complaining of an aching, cramping, dull, hot-burning, pins and needle, pressure like a sharp, stabbing, and throbbing pain. (Tr. at 689).  The pain radiated to her right leg.  (Tr. at 689).  Plaintiff reported that with the increase in her medications, she had been doing a lot better and that her medications were working well for her.  (Tr. at 689).  Dr. Legrande noted that Plaintiff's gait was normal and she was able to heal walk and toe walk.  (Tr. at 690).  Similarly, on November 1, 2012, December 3, 2012, January 9, 2013, February 7, 2013, March 6, 2013, and May 22, 2013, Plaintiff reported to Dr. Legrande that, with medication, Plaintiff was able to do all activities of daily living including walking, standing, and sitting, but had problems with these activities without medication.  (Tr. at 693, 695, 700, 703, 706,).  On January 9, 2013, Dr. Legrand ran a random drug screen and Plaintiff tested positive for cocaine and Plaintiff admitting using cocaine recreationally only. (Tr. at 696).

The latest treatment record from Dr. Legrande is dated July 1, 2013.  (Tr. at 719). Plaintiff reported bilateral pain including aching, hot-burning, shooting, stabbing, and throbbing

---

[5]  On August 30, 2012, Dr. Legrande increased Plaintiff's Dilaudid prescription by one pill a day to relieve Plaintiff's increased pain.  (Tr. at 687).

pain radiating bilaterally to the lower extremities.  (Tr. at 719).  Plaintiff reported that the pain

increased when sitting and standing a long time and when standing straight up.  (Tr. at 719).

Again, with medication Plaintiff was able to do all activities of daily living, but not without

medication.  (Tr. at 719).  Plaintiff was experiencing numbness in her legs, but the treatment

notes indicated that her medications were working well to neutralize her pain.  (Tr. at 719, 721).

On July 15, 2013, Dr. Legrande completed a Physical Capacity Evaluation for Plaintiff.

(Tr. at 669-70).  Dr. Legrande found Plaintiff was capable of the following:

> (1)  Standing/Walking 1 hour at a time in an 8-hour workday;
>
> (2)  Standing/Walking 3 hours total in an 8-hour workday;
>
> (3)  Sitting 1 hour at a time in an 8-hour workday;
>
> (4)  Sitting 3 hours total in an 8-hour workday;
>
> (5)  Lifting occasionally11-20 pounds;
>
> (6)  Simple grasping;
>
> (7)  Occasionally bending and crawling; and
>
> (8)  Reaching above shoulder level.

(Tr. at 669-70).  Dr. Legrande determined that Plaintiff was unable to perform pushing and

pulling and fine manipulation with her hands; using feet for repetitive movements; squatting; and

climbing.  (Tr. at 669-70).  Dr. Legrande found these limitations were effective as of the onset

date of February 1, 2008.  (Tr. at 670).

### 3.        ALJ's Consideration of Dr. Legrande's Opinion

After the first hearing, the ALJ received additional evidence from Dr. Legrande,

including her treatment notes and her Physical Capacity Evaluation.  (Tr. at 13).  Thereafter, the

ALJ ordered a consultative examination, which was completed by Robert Shefsky, M.D. on August 28, 2013.  (Tr. at 13).

The ALJ accurately considered Dr. Legrande's treatment notes, summarizing both Plaintiff's reports to Dr. Legrande and Dr. Legrande's findings.  (*See* Tr. at 21-22).  The ALJ concluded that Dr. Legrande's treatment notes indicated mostly normal findings for Plaintiff. (Tr. at 23).  The ALJ considered that Plaintiff was on strong pain medication, but noted that Plaintiff did not report side effects from those medications to Dr. Legrande.  (Tr. at 23).

The ALJ also reviewed Dr. Legrande's Physical Capacity Evaluation and compared Dr. Legrande's findings to her treatment records, finding them to be inconsistent.  (Tr. at 25).  The ALJ cited to Dr. Legrande's April 10, 2012, October 1, 2012, April 3, 2013, and July 1, 2013 treatment records.  The ALJ noted that Dr. Legrande found Plaintiff able to do all activities of daily living including walking, standing, sitting, and climbing stairs, was alert and oriented, and was in no acute distress.  (Tr. at 25).  The ALJ also considered that these treatment notes indicated that there was a normal range of motion in the cervical spine, and no abnormality in the lumbar spine with normal range of motion there as well.  (Tr. at 25).  In addition, the ALJ noted that these records indicated straight leg raises were negative bilaterally, and Plaintiff reported her medications were working well.  (Tr. at 25).  The ALJ found that Dr. Legrande continued Plaintiff on the same regimen.  (Tr. at 25).  The ALJ afforded little weight to Dr. Legrande's opinion that Plaintiff was able to work only a six-hour day, and found this conclusion to be inconsistent with the overall evidence of record and Dr. Legrande's own findings.  (Tr. at 25).

### 4.      Analysis

Plaintiff argues that the ALJ erred in relying on Dr. Legrande's treatment notes indicating that Plaintiff was able to perform activities of daily living, including walking, standing, sitting,

and climbing stairs, and had an improved mood along with normal physical examination findings. (Doc. 18 at 13). Plaintiff contends that these treatment notes also show that Plaintiff was prescribed multiple strong opiate pain medications, including methadone and Dilaudid as well as prescription strength ibuprofen and Valium. (Doc. 18 at 13). Plaintiff claims that her perceived improvements appear to be transitory and temporary. (Doc. 18 at 13). Plaintiff acknowledged that she had some improvement in her pain symptoms, but reported to Dr. Legrande that at times her pain was a nine out of ten, she woke up during the night in pain, had difficulty walking, and had some rough months. (Doc. 18 at 13). Plaintiff argues that her pain regimen indicates the severe nature of her pain symptoms. (Doc. 18 at 13). Plaintiff also argues that the ALJ erred in picking and choosing some evidence that supports her decision while ignoring other evidence. Further, Plaintiff contends that the ALJ ignored Plaintiff's longitudinal record of care. (Doc. 18 at 14).

In response, the Commissioner argues that the ALJ considered Dr. Legrande's longitudinal treatment records and Plaintiff's pain regimen. (Doc. 21 at 11). In fact, the Commissioner asserts that Dr. Legrande's final treatment notes prior to completing the Physical Capacity Evaluation showed that Plaintiff was able to perform all of her activities of daily living. (Doc. 21 at 11). The Commissioner states that the ALJ acknowledged Plaintiff's prescriptions, but noted that Plaintiff did not report medication side effects. (Doc. 21 at 11). Further, the Commissioner contends that Dr. Legrande failed to support her opinion with clinical findings, appearing to credit Plaintiff's subjective complaints without clinical support. (Doc. 21 at 12). The Commissioner also indicates that the ALJ discussed the imaging results in the record, showing only mild and no acute findings. (Doc. 21 at 14).

After consideration of Dr. Legrande's treatment notes, her opinion, and the ALJ's conclusions concerning Dr. Legrande's treatment notes and opinion, the Court finds that the ALJ properly considered Dr. Legrande's opinion, stated with particularity the weight given to Dr. Legrande's opinion, and showed good cause for not affording great or substantial weight to Dr. Legrande's opinion.  As summarized above, the ALJ thoroughly reviewed Dr. Legrande's treatment notes.  The ALJ indicated that Dr. Legrande's treatment notes demonstrated essentially normal findings, but also noted that Dr. Legrande appears to have credited Plaintiff's complaints as evidenced by the strong pain medication prescribed.  (Tr. at 23).  The ALJ also noted that while on the strong pain medication, Plaintiff did not report any side effects to her physician. (Tr. at 23).  The ALJ reviewed the objective medical testing, Plaintiff's history of scoliosis, and degenerative changes, but noted that there were no severe degenerative disc disease or stenosis, and noted there was no obvious concern.  (Tr. at 23).

The ALJ determined that Dr. Legrande's assessment was not consistent with the overall evidence or Dr. Legrande's own findings.  (Tr. at 25).  Taken directly from Dr. Legrande's treatment notes, the ALJ noted that with medication, Plaintiff was able to do all activities of daily living, including walking, standing, sitting, and climbing stairs.  (Tr. at 25).  Yet, Dr. Legrande opined that Plaintiff was only able to work six (6) hours a day.  (Tr. at 25).  The ALJ referred to Dr. Legrande's treatment notes indicating that Plaintiff was in no acute distress, had a normal range of motion in the cervical spine, no abnormality in the lumbar spine with normal range of motion, straight leg raise was negative bilaterally, and Plaintiff reported that her medications worked well.  (Tr. at 25).  Even on the final treatment note prior to the date of Dr. Legrande's Physical Capacity Evaluation, Dr. Legrande found no scoliosis, motor examination revealed no

abnormalities, Plaintiff's medications were working well to neutralize pain, and she was able to perform activities of daily living.  (Tr. at 25).

Here, the ALJ stated with particularity that she afforded Dr. Legrande's opinion little weight due to the inconsistency between Dr. Legrande's opinion and Dr. Legrande's treatment notes.  The ALJ was required to demonstrate good cause for not affording Dr. Legrande's opinion substantial or considerable weight.  To establish good cause, one factor to consider is whether the physician's own treatment notes are consistent with her opinion.  *See Phillips,* 357 F.3d at 1240.  In this case, the ALJ found that Dr. Legrande's treatment notes that repeatedly indicated that Plaintiff was able to perform her activities of daily living, including walking, standing, and sitting were inconsistent with Dr. Legrande's opinion that Plaintiff was able to stand/walk and sit for a total of only six (6) hours in an eight (8) hour workday.  Moreover, Dr. Legrande's Physical Capacity Evaluation includes only check marks and failed to include any explanation or support for the very restrictive nature of Dr. Legrande's conclusions as to Plaintiff's limitations.  The Court finds that for these reasons, the ALJ demonstrated good cause for affording Dr. Legrande's opinion little weight.  Therefore, the Court finds that the ALJ's did not err in affording Dr. Legrande's opinion little weight and this determination is supported by substantial evidence.[6]

---

[6]  Plaintiff also asserts that the ALJ erred in affording little weight to Dr. Legrande's opinion yet accorded great weight to the opinion of one-time consultative examiner Dr. Shefsky.  (Doc. 18 at 15).  As the Court stated above, the Court finds that Dr. Legrande's treatment notes are inconsistent with her opinion as to Plaintiff's limitations and, thus, the Court need not reach the issue of the weight afforded Dr. Shefsky's opinion.

## III.    Conclusion

Upon consideration of the submissions of the parties and the administrative record, the Court finds that the decision of the ALJ is supported by substantial evidence and decided upon proper legal standards.

**IT IS HEREBY ORDERED:**

The decision of the Commissioner is hereby **AFFIRMED** pursuant to sentence four of 42 U.S.C. §405(g).  The Clerk is directed to enter judgment accordingly, terminate any pending motions and deadlines, and close the case.

**DONE AND ORDERED** in Fort Myers, Florida on February 14, 2017.

MAC R. MCCOY
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties